CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review pursuant to N.J.S.A. 54:3-21 of the 1983, 1984 and 1985 assessments on real property located at 1000 Secaucus Road, Secaucus, New Jersey (Block 16, Lot 5.42R). The assessments were the same for all three years, viz:
Land $1,398,000
Improvements 4,295,500
Total $5,693,500
At issue are the true value of the property (for all years involved), whether plaintiff is entitled to relief from a discriminatory assessment pursuant to N.J.S.A. 54:51A-6 and whether defendant is entitled to an increase by virtue of the same statute.
The subject of the controversy is a one-story masonry and steel-framed building containing a gross floor area of 202,040 square feet. The building is occupied by plaintiff and by Addressograph-Multigraph Corporation under long-term net leases. The building, constructed by Hartz Mountain in 1976, is characteristic of warehouse-retail outlet structures erected by Hartz in the 1960s and 1970s in Secaucus. The building has 40' x 50' truck bays, concrete flooring, oil-fired hot air heat and air conditioning, and 28-foot ceilings with 26-foot clearance. The west side of the building features 18 truck doors, eight of them with levelers. Plaintiff occupies 107,233 square feet of floor area and 19,980 square feet of mezzanine. Addressograph-Multigraph occupies 74,934 square feet. The site, which comprises 9.323 acres in all, is also improved with 88,440 square feet of macadam paving as well as chain link fencing and landscaping. The parking lot accommodates 168 automobiles. The subject property is located in the midst of an active and continually growing industrial market with ready access to highways leading to New York City and heavily industrialized metropolitan areas in northern New Jersey.
Plaintiffs expert estimated the true value of the subject property to be $4,500,000 on October 1, 1982, $4,800,000 on *393 October 1, 1983 and $5,000,000 on October 1, 1984. In arriving at these estimates he gave equal weight to the cost and income approaches, which he used for the first two years; he placed exclusive reliance on the income approach for tax year 1985. His value estimates using the cost approach were $4,506,500 and $4,778,500 for October 1, 1982 and October 1, 1983, respectively. He disdained the use of costs manuals because, he declared, they provided no data for buildings of 200,000 square feet. He used Hartz’ historic building costs with an adjustment for time. He failed to account, however, for soft costs, except for engineering and architect’s fees.
His income approach for all three years was predicated on net leases in five allegedly comparable properties, four of which were located in Secaucus, with the fifth situated in North Bergen. From the economic income thus derived he deducted a 3% vacancy allowance and 6% for repair, reserves and management fees, applying to effective net income a capitalization rate of 12.46% for 1983 and 12.28% for 1984 and 1985. His capitalization rates were developed under the band of investment, mortgage-equity method with a 75% mortgage component (at 13% for 1983 and 12.75% for 1984 and 1985), a 30-year direct reduction amortization and a 25% equity position at 10%.
Defendant’s expert estimated the property’s true value to be $5,860,000 for 1983, $6,734,500 for 1984 and $7,439,200 for 1985. In developing these estimates he resorted to the market data and income approaches, with primary emphasis on the latter. He eschewed the cost approach because, he averred, obsolescence factors were not amenable to reliable measurement, and, moreover, the cost approach was confined to structures of a special or unique nature which could not be valued by the other approaches. His market data approach consisted of three sales of allegedly comparable properties in Secaucus. These properties, which were sold in 1980 and 1983, ranged in building size from 66,240 square feet to 409,695 square feet, in lot size from 2.73 acres to 30 acres and in unit selling price from $27.95 a square foot to $33.78 a square foot.
*394 The expert’s income approach was based upon six net leases of allegedly comparable properties, all in the Hartz complex in Secaucus. From the economic income thus derived he deducted a 2V2% vacancy allowance and 6% of effective gross income for repairs, maintenance and management. He then capitalized effective net income by 12.3% for 1983 and 11.8% for 1984 and 1985. His capitalization rates were developed by means of the band of investment, mortgage-equity method, whereby he assumed 70% mortgage and 30% equity positions for all three years. He posited a 10% equity return for all three years; and he assumed mortgage interest rates of 12V2% for 1983 and 12% for 1984 and 1985. In all cases he assumed a direct reduction amortization period of 25 years.
The cost approach utilized by plaintiff’s expert is not probative of the true value of the subject property. To begin with, while actual cost is some evidence of value, Bostian v. Franklin State Bank, 167 N.J.Super. 564, 401 A.2d 549 (App.Div. 1979) , on remand 1 N.J.Tax 270 (Tax Ct.), aff’d o.b. per curiam 179 N.J.Super. 174, 2 N.J.Tax 391, 430 A.2d 1140 (App.Div. 1980) , it is by no means controlling.
Plaintiff’s expert admitted that the actual construction costs incurred by the owner, Hartz Mountain Industries, were lower than prevailing costs at the time of construction. Also, all existing buildings, except relatively new ones, were constructed some years ago, and they are ordinarily not entirely representative of current construction methods and materials. See O’Flaherty, “Cost Approach to Value,” Friedman, Encyclopedia of Real Estate Appraising, (3 ed. 1978) 63, 69. In the instant case the improvements on the subject property were erected some six years prior to the earliest assessing date; and there is no evidence to show that construction methods and materials were the same — or substantially so — in 1976 as in 1982.
Resort to a well-recognized cost manual would have obviated this difficulty, but the expert eschewed cost manuals because, *395 he claimed, they did not deal with 200,000 square foot structures.
Secondly, except for engineering and architect’s fees, the expert failed to include indirect costs in his cost estimates. These costs are, in addition to engineering and architect’s charges, financing, insurance and permits, taxes, management and other overhead and entrepreneurial profit. Id. at 70. Failure to reflect entrepreneurial profit, the most substantial of these indirect costs, in his cost estimate is fatal to the probative utility of the expert’s cost approach. Lawrence Assoc. v. Lawrence Tp., 5 N.J.Tax 481 (Tax Ct.1983). See American Institute of Real Estate Appraisers, The Appraisal of Real Estate, (8 ed. 1983) 454.
Finally, where, as in this case, other approaches offer more persuasive evidence of true value, the cost approach will not be used; it will be confined to special or unique property for which there is no market. Little Ferry Boro. v. Vecchiotti, 7 N.J.Tax 389 (Tax Ct.1985).
This leads us to an examination of the income approaches used by both experts. The subject property has been leased since its construction to plaintiff and to Addressograph-Multigraph Corporation under long-term net leases with the owner, Hartz Mountain Industries. The property is of the type which is customarily bought and sold on the basis of its income stream. Thus, the income approach is the preferred method of determining true value. Center-Whiteman Corp. v. Fort Lee, 4 N.J.Tax 153 (Tax Ct.1982). See Helmsley v. Fort Lee, 78 N.J. 200, 213-214, 394 A.2d 65 (1978).
Inquiry into the income method begins with an examination of the economic rent posited by the experts, as proof of economic rent is indispensable to the income approach. Irvington v. 1125-1127 Clinton Ave. Associates, 5 N.J.Tax 420 (Tax Ct. 1983).
Plaintiff’s expert posited economic rent at $3.20 a square foot net for ground floor and $2.40 a square foot net for mezzanine for 1983, and increased these amounts by 5% in each of the *396 ensuing two years. He relied upon a lease at 20 Enterprise Avenue, Secaucus (comparable lease # 1) executed in 1980 (two years before the earliest assessing date) for $3 a square foot. Plaintiff’s expert admitted that he was never inside that building, but he “assumed” it was a one-story structure. Credible evidence proferred by defendant indicates that the building was in fact a two-story structure. It is reasonable to infer — and this court does so infer — that the $3 a square foot rent is an average of rent charged for first-and second-story space, with the second story commanding a lower unit rental than the first floor. The expert even acknowledged that, if comparable lease # 1 embraced two floor levels it was inferior to the subject. This lease does not support the expert's conclusion. The expert also conceded that the alleged comparable lease at 80-90 Enterprise Avenue, Secaucus, executed September 1,1981 for $2.44 a square foot (comparable lease # 3), was inferior to the subject. The testimony also shows that the execution of comparable lease # 3 may have been accompanied by a sense of urgency on the landlord’s part in view of the bankruptcy of a prior tenant. As with comparable lease # 1, this lease is not probative of economic rent for the subject.
The expert’s comparable lease # 4, involving property at 125 Castle Road, Secaucus, executed January 1, 1983 for $2.65 a square foot, was also acknowledged to be inferior to the subject. For that reason, and without the benefit of adjustments to account for the differences, comparable lease # 4 is not probative of economic rent. Comparable lease # 5 involves 547,000 square feet on 22.6 acres in North Bergen, leased on June 7, 1982 for $3 a square foot. Without adjustments for significant size differences and the difference in tax rates (which affect the rent charged under a net lease) between North Bergen and Secaucus, this lease is not probative of economic rent for the subject.
The expert did not testify with respect to comparable lease # 2, nor does his appraisal report indicate how the property involved in that lease compares to the subject. All the record shows is that comparable lease # 2 involve property located at *397 50 Hartz Way, Secaucus, that the lease was executed on September 1, 1981 for $2.82 a square foot, that the building contained 248,635 square feet and was sited on 9.38 acres, and that the building was erected in 1978. No proofs were submitted to indicate the type of construction, whether the building was one or two stories, whether the building was devoted entirely to warehousing or was a combination of warehouse and retail outlet. In the absence of proofs of comparability, comparable lease # 2 must be rejected as support for the expert’s conclusion.
In short, plaintiff’s expert has offered no persuasive evidence of economic rent.
Defendant’s expert posited economic rent at $3.90 a square foot for tax year 1983, $4.30 a square foot for tax year 1984 and $4.75 a square foot for tax year 1985, relying upon six leases of properties built and owned by Hartz Mountain Industries or its affiliate. The leases, which were all net leases, were executed between September 1980 and November 1983 and ranged in unit rent from $3 a square foot to $5 a square foot. Lease # 2 will be ignored, as it involves 20 Enterprise Avenue and it appears to suffer from the same infirmities which afflict comparable lease # 1 proferred by plaintiff’s expert. The most recently executed leases utilized by defendant’s expert all involve property at 50 Enterprise Avenue (comparable leases # 4, # 5 and # 6). Those leases were executed in January 1982, July 1983 and November 1983 for unit rentals of $3.23 a square foot, $5 a square foot and $4.50 a square foot, respectively. Adjusting the earliest rental for time at the rate of 5% annually, the average rental for the three leases at 50 Enterprise Avenue is $4.30, which is substantially the economic rent estimated by defendant’s expert for tax year 1984. These three leases constitute the most credible evidence of economic rent. The expert’s assumption of a 10% annual increase in market rent is not supported by the evidence. While it is difficult to discern a pattern from the 11 leases submitted by both experts the strong, continuing market for industrial property in Secaucus points to some annual increase in market rents. I will thus *398 accept the estimate of plaintiff’s expert in this regard; and I find that market rents in Secaucus have increased by approximately 5% annually.
Thus, I find the economic rent for the subject property to be $4.10 a square foot for tax year 1983, $4.30 a square foot for tax year 1984 and $4.50 a square foot for tax year 1985.
The vacancy and loss allowance of 3% posited by plaintiff’s expert is a more realistic and prudent estimate of the long-term quality and durability of the rental income stream than the 2/4% proffered by defendant’s expert. While the latter properly relied upon the vigor of the industrial rental market in Secaucus in projecting his vacancy allowance he ignored the possibility of collection losses arising from business reverses of a tenant. Thus, I find 3% to be a reasonable allowance for both vacancy and collection loss.
There is no disagreement between the experts over expenses. Both experts project 6% of effective gross income as reasonable expenses under a net lease for repairs, maintenance and management.
This leads to the final item of controversy, the appropriate capitalization rate. The experts agree on a 10% cash-on-cash equity return. They differ on all other components.
The compendious data assembled by the American Council of Life Insurance (ACLI) and Reproduced in The Appraiser magazine points to mortgage interest rates of 13% for the last quarter of 1982 (the appropriate portion of the pretax year for tax year 1983), 12%% for the same period in 1983 (for tax year 1984) and 12%% for the fourth quarter of 1984 (for tax year 1985) . ACLI data provide a useful benchmark to aid this court in selecting the appropriate capitalization rate. Knollcroft Apartments, Inc. v. Fair Lawn, 3 N.J.Tax 25 (Tax Ct.1981).
On the basis of this data I find that the mortgage interest rate to be used in the development of a capitalization rate in this case is 13% for tax year 1983, 12%% for tax year 1984 and 12%% for tax year 1985.
*399 The strong, continuing industrial market in Secaucus leads me to conclude that the mortgage lender can safely assume the risk of a 75% mortgage position and a 30-year amortization schedule. (The court notes that there is often no connection between the length of the amortization period and the maturity of the mortgage loan.)
Accordingly, the court finds the capitalization rates to be as follows:
1983
75% mortgage — 30 years @ 13%, constant 13.28% 9.96%
25% equity @ 10% 2.50%
12.46%
1984
75% mortgage — 30 years @ 123/4%, constant 13.04% 9.78%
25% equity @ 10% 2.50%
12.28%
1985
75% mortgage — 30 years @ 12%%, constant 13.04% 9.78%
25% equity @ 10% 2,50%
12.28%
In view of the foregoing I find the true value of the subject property to be $6,061,800 for 1983, $6,450,700 for 1984 and $6,750,700 for 1985, all developed under the income approach as follows:
*400 1983 1984 1985
Gross income $828,364 .$868,772 $909,180
Less vacancy & collection loss (3%) 24,850 26,063 27,275
Effective gross income $803,514 $842,709 $881,905
Less repairs, maintenance & management (6%) 48,211 50,562 52,914
Effective net income $755,303 $792,147 $828,991
Capitalization rate 12.46% 12.28% 12.28%
True value (rounded) $6,061,800 $6,450,700 $6,750,700
A district-wide revaluation took effect in Secaucus for tax year 1983. Chapter 123 is thus inapplicable. N.J.S.A. 54:51A-6(d). Accordingly, in the absence of a timely counterclaim, i.e., one filed prior to August 15 of the tax year, an increase in the assessment is not permitted for 1983, notwithstanding the court’s finding of true value in excess of the assessment. F.M.C. Stores Co. v. Morris Plains Boro. 100 N.J. 418, 495 A.2d 1313 (1985). As no counterclaim was filed by defendant municipality for 1983, the assessment for that year will be affirmed.
Different issues are presented by tax years 1984 and 1985. N.J.S.A. 54:51A-6, which applies to those years, sets out three conditions pursuant to which the court will revise property tax assessments:
a. Whenever the tax court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property except as hereinafter provided.
b. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.
c. If both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the county percentage level to the true value of the property.
*401 Application of this statute is automatic; and, if warranted by the court’s finding of true value, an assessment may be increased pursuant to the statute whether or not a counterclaim has been filed seeking an increase. Weyerhaeuser Co. v. Closter Boro., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div. 1983); Devonshire Development Assoc. v. Hackensack, 184 N.J.Super. 371, 2 N.J.Tax 392, 446 A.2d 201 (Tax Ct.1981). See F.M.C. Stores Co. v. Morris Plains Boro., supra, 100 N.J. at 428-430, 495 A.2d 1313 (court distinguishes a municipality’s claim for increased assessment in year to which chapter 123 does not apply).[1]
Thus, N.J.S.A. 54:51A-6 will be applied in this case and, if the court’s finding of true value so warrants, the assessment will be increased.
The average ratio referred to in the quoted statute is that ratio promulgated by the Director, Division of Taxation for a taxing district as of October 1 of the pretax year for school aid purposes (N.J.S.A. 54:1-35.1); and the common level range is that range which is plus or minus 15% of the average ratio for a taxing district. N.J.S.A. 54:l-35a. The average ratio promulgated by the Director for defendant municipality was 120.6% for 1984 and 108.9% for 1985. The lower limit of the common level range was 102.51% for 1984 and 92.56% for 1985. The ratio of assessment to true value as hereinabove found is 88% for 1984 and 84% for 1985. Thus, subsections (b) and (c) of N.J.S.A. 54:51A-6 are inapplicable because the average ratio is not below the county percentage level (100% in all counties) and the ratio of assessment to true value does not exceed the county percentage level. We are therefore left with subsection (a), which, on its face, requires application in both 1984 and 1985 of a ratio in excess of 100% of the true value of the property, as the ratio of assessment to true value is below the lower limit of the common level range in those years.
*402 However, other statutes set true value as the upper limit of real property tax assessments. N.J.S.A. 54:4-2.25 provides:
All real property subject to assessment and taxation for local use shall be assessed according to the same standard of value, which shall be the true value of such property and the assessment shall be expressed in terms of the taxable value of such property, which taxable value shall be that percentage of true value as shall be established by each county board of taxation as the level of taxable value to be applied uniformly throughout the county.
N.J.S.A. 54:4-2.26 provides:
Every percentage level of taxable value of real property established by a county board of taxation shall be expressed as a multiple of 10%, and no level so established shall be lower than 20% or higher than 100% of the standard of value.
The quoted statutes, along with N.J.S.A. 54:51A-6, form part of a comprehensive plan for the assessment of real property taxes and thus must be read in pari materia. Dvorkin v. Dover Tp., 29 N.J. 303, 148 A.2d 793 (1959). Where related statutes appear to conflict it is the court’s function to construe those statutes so as to make a consistent, harmonious whole of the legislation. State v. A.N.J., 98 N.J. 421, 487 A.2d 324 (1985). Thus, the direction in subsection (a) of N.J.S.A. 54:51A-6 to apply the average ratio under the conditions therein described must be read in light of the limitation imposed by N.J.S.A. 54:4-2.26, namely, that real property tax assessments may not exceed 100% of true value.
In view of the foregoing the assessments for 1984 and 1985 will be fixed at the true value for those years, as hereinabove determined.
Judgment will be entered setting forth the assessments for all years in issue as follows:
1983 1984 1985
Land $1,398,000 $1,612,700 $1,687,700
Improvements 4,295,500 4,838,000 5,063,000
Total $5,693,500 $6,450,700 $6,750,700

 Defendant filed counterclaims for 1984 and 1985 on August 15 of each year.