KAHN, J.T.C.
This matter is a local property tax appeal for 1995 and 1996 tax years. The relevant assessment dates are October 1, 1994 and October 1, 1995. For both years in question, the assessment appealed from is:
Land $ 235,000
Improvements 5,619,500
Total $5,854,500
The average ratio and common level range as promulgated by the Director of the Division of Taxation for the Township of West Orange in each of the years in question is as follows:
Year Average Ratio Upper Limit Lower Limit
1995 50.47% 58.04% 42.90%
1996 51.78% 59.55% 44.01%
The property at issue is located at 271 Mt. Pleasant Avenue, West Orange, Essex County, New Jersey, also known as Block 8401, Lot 10. The subject is located on the top of First Watchung Mountain, in a planned unit residential development (PURD) Zone. The property consists of 2.27 acres of land upon which is situated a 50,000 square foot, four-story, masonry and steel structure that was constructed in 1985. Taxpayer erected the improvements after applying for and receiving a use variance and a variance permitting less parking than required by the applicable *29 zoning ordinance.[1]
MCI Telecommunications Corporation (hereinafter “taxpayer”) purchased the land from Vicon Corp. in 1983. MCI acquired the subject property to serve as a junction station at which communications would be received and distributed to other locations.
The first three floors of the building contain open areas, which house telecommunications equipment, generators, and chillers used to cool same. The improvements contain heavy load-bearing concrete floors raised for computers, and cinder block walls with ceiling tiles. There are several offices that use the elevators located at the rear of the building, which services only the first three floors. There are few windows on the first floor and no windows on the second and third floors. The first three floors do not contain central heating or air conditioning systems. The heavy equipment used for the telecommunications process provides sufficient heat, and certain equipment, known as “chillers”, are required to cool the equipment. New personnel occupy the first three floors.
The fourth floor of the building consists of office space occupied by Vicon. Pursuant to a lease agreement between Vicon and taxpayer, Vicon leases the fourth floor for a nominal consideration of one dollar ($1.00) per year.[2] This floor contains 12,500 square feet of individual offices, conference rooms, kitchen, dining area, bedrooms, and lavatory facilities, and is fully heated and air conditioned. Both appraisers described the finish as high quality, which is evident from the photographs in the appraisal reports submitted to this court. Accordingly, there is no dispute that the offices are ornate.
*30 In addition to describing aforesaid structure, testimony revealed the existence of a tunnel of approximately 1480 feet which extends from the subject building to an adjacent property not under appeal herein, but owned by the taxpayer. Both a radio tower and antenna are situated on that adjacent property. The tunnel was apparently intended to house communications cable strung between the subject pi’operty and the radio tower. Testimony diseloséd that taxpayer no longer uses the radio tower and tunnel.
Both parties acknowledge that the subject property is over-assessed. Taxpayer utilized all three methods of valuation: cost, sales comparison, and income capitalization. Based upon the three valuation methods employed, taxpayer concluded the subject’s value to be $3,100,000 for both years-at issue. By contrast, the municipality only applied the cost approach and concluded the subject’s value to be $7,000,000. Either result requires Chapter 123 relief pursuant to N.J.S.A. 54:51A-6(a).

HIGHEST AND BEST USE

The main issue in dispute is the subject property’s highest and the best use. Taxpayer contends the highest and best use of the property is that of a combination data center (first three floors) and office (fourth floor) for a single user. The municipality contends the highest and best use is that of its intended and current use — a combination of high-tech telecommunications transmission facility (special purpose) and new office building.
As stated by the Tax Court in Hackensack Water Co. v. Woodcliff Lake Bor., 9 N.J.Tax 545 (Tax 1988):
The first step hi the valuation process is to determine the highest and best use of the land. As we said in West Orange v. Goldman's Estate, 2 N.J.Tax 582 (Tax 1981):
The fitness and availability of property for particular uses must be considered in arriving at taxable value, rather than the fact of actual use ... Determination of highest and best use thus requires analysis of the likelihood of profitable alternate uses ... viewed as of the critical date, i.e., in tax cases, the assessing date ... Such alternate uses, however, must not be “remote, speculative or conjectural,” ... To put it differently remote uses are irrelevant and property valuation should have some relationship to reality.
*31 [Id at 551 (citation omitted).]
Highest and best use is defined by The Appraisal Institute as:
the reasonably pi-obable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and results in the highest land value.
[Appraisal Institute, The Appraisal of Real Estate 297 (11th ed.1996). J
Taxpayer produced two expert witnesses. One witnesses testified solely on the issue of highest and best use. The other witness, taxpayer’s appraiser, evaluated highest and best use and testified well as to valuation. The appraiser testified that, as of the relevant assessment dates, the facility was not being used as it was at the time of construction because of technological advancements.
The municipality’s evidence presented only one appraisal witness who opined that the subject property’s highest and best use is, as it is currently operated, a telecommunications facility with one floor dedicated to office space. Moreover, the municipality established that the taxpayer’s improvements made to the subject property were based on taxpayer’s specific requirements at the time of construction. For example, taxpayer sought a variance for less parking space than would be required for a general office building because less space was needed for the operating the subject property as a telecommunications building.
For the reasons set forth herein, this court finds that the greater weight of the reliable evidence supports the municipality’s position that the highest and best use of the subject property is as currently utilized, a telecommunications facility, with one floor dedicated to office space. Taxpayer did not prove by a preponderance of the evidence that the property’s use changed. Rather, taxpayer continues to use the property as originally intended, as a telecommunication transmission facility.
From the facts presented to this court, the high-tech telecommunications transmission facility is a special purpose property. The Supreme Court of New Jersey, in Ford Motor Co. v. Edison Tp., 127 N.J. 290, 604 A.2d 580 (1992), described special purpose property as follows:
*32 Special-purpose property is most easily understood in terms of property that “cannot be converted to other uses without large capital investment,” such as a public museum, a church, or a highest-specialized production facility like a brewery.
[Id. at 299, 604 A2d 580 (citation omitted).]
Furthermore, the Appellate Division in CPC Int’l, Inc. v. Englewood Cliffs Bor., 193 N.J.Super. 261, 473 A.2d 548 (App.Div.), certif. denied, 97 N.J. 578, 483 A.2d 124 (1984) determined that:
no allowance will be made for the special purpose character of the building or for overbuilt features where the original owner erected the building for his own needs, remains in possession, and continues to enjoy the improvements which it installed and for which the allowance is claimed.
[Id. at 269, 473 A.2d 548.]
According to the Appellate Division,
“Functional obsolescence” is a term used to describe the diminution of a building’s market value resulting from the fact that it contains costly features which were installed to gratify the owner or which are unique to the special purpose of the building but which do not enhance its value on the market. The terms “superfluity” “duplication of facilities” and “overbuilding” are also used to describe such structures whose functional characteristics exceed reasonably foreseeable demands. Investments made to satisfy the whim of an owner or for a special purpose, or out of. extravagance are not necessarily reflected in the building’s fair market value. Id. [Bostian v. Franklin State Bank, 167 N.J.Super. 564] at 570 [401 A.2d 549 (1979)]. This is unrelated to factors such as outmoded characteristics associated with the age of the building or failure to keep pace with advancing technology
[Id at 265, 473 A.2d 548 (citations omitted).]
It is clear from the testimony that taxpayer intended and designed the improvements for the purpose of maintaining a telecommunications facility. Although there are few windows, less parking, no independent heating or cooling system and one elevator, this facility is being used as originally intended. The fact that the taxpayer no longer uses the radio tower on the adjacent property and tunnel connected thereto is not a factor in this court’s finding of highest and best use. Despite the contention of taxpayer’s expert that, with only minor renovation costs, the facility could be converted into a data center to house computer equipment, that fact does not change the entire purpose of the structure, which has been maintained as a telecommunications facility with one floor dedicated to office space. The improved property’s current use is a “reasonably probable and legal use” that is “physically possible, appropriately supported, financially *33 feasible, and results in the highest value,” The Appraisal of Real Estate, supra at 297. Accordingly, this court finds that the subject’s highest and best use is that of its intended and current use, a combination of high-tech telecommunications transmission facility (special purpose) and new office building.

VALUATION

As stated above, taxpayer’s appraiser applied all three recognized valuation methods. He determined that the highest and best use of the subject property is that of a data center, not as a high-tech telecommunications building as originally planned and utilized. While taxpayer’s appraiser utilized all three methods, the municipality’s appraisal witness relied on the cost approach based on the subject property’s highest and best use as a special purpose telecommunications building.
Although the taxpayer’s analysis utilized all three methods of valuation, taxpayer erroneously relied on the property’s highest and best use as a data center rather than a telecommunications transmission facility, with one floor dedicated to office space, when analyzing the subject property’s value. Since the municipality based its analysis on the property’s highest and best -use as a special purpose telecommunications facility, this court finds the municipality’s analysis under the cost approach the most reliable valuation method for the subject property.
This court, having determined the subject property’s highest and best use, concludes that the only approach to valuation of a special purpose property is the cost approach.
“[Clourts of this state have long recognized that for certain types of unique property that were constructed for a special purpose and are only suited for that particular purpose, the market and income approaches to values are not aplicable”. “With regard to such special purpose properly, the cost approach is usually relied upon for property tax valuation purposes.”
[Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 299, 604 A.2d 580 (citations omitted). |
Moreover, the Tax Court in Brockway Glass Co. v. Freehold Tp., 10 N.J.Tax 356 (Tax 1989), aff’d, 12 N.J.Tax 263 (App.Div.1991), remanded 130 N.J. 3, 611 A.2d 643 (1992), concluded:
*34 If the evidence of value by the cost approach is reasonable, given the analysis of the expert advocating that value, then for local property tax purposes, the cost ■approach fixes the value of the real estate. In this regard,
[t]he weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. The weight and value of expert testimony are for the trier of facts. An expert’s opinion may be adopted in whole or in part or completely rejected.
[Id. at 374 (citations omitted).]
The municipality’s appraisal witness utilized the Marshall & Swift Cost Manual. Based upon his examination of the property, the witness concluded that the basic structure cost for 50,000 square feet of building space was $110 per square foot, totaling $5,508,451.[3] To that cost he added asphalt paving of $146,000 and parking lot lighting in the amount of $16,500, totaling $5,670,951.
The municipality’s appraisal expert added the following additional cost factors to the aforesaid basic cost ($5,670,951):
(A) Underground tunnel $500,000
(B) Canopy front elevation — 528 Sq. Ft. 2,500
(C) Walks, Steps, Handrails 2,500
(D) Landscaping, rough grading, storm drains 75,000
$580,000
The total of these additional costs and the basic cost of $5,670,-951 is $6,250,951. Moreover, the witness observed severe rock formation at the site, and, therefore, added an additional 15% for the cost of construction, totaling $937,643. The witness added the-15% additional cost to $6,250,951, resulting in a total replacement cost of the subject improvements of $7,188,594.
In order to determine the extent of depreciation/obsolescence, the municipality’s appraisal expert applied the age-life method. He observed minimal physical, functional, and external obsolescence. The appraiser ascertained that twelve years is the actual and effective age of the improvements, estimated the total economic life of the building at sixty years, and concluded depreci *35 ation/obsolescence at 20%. This court recognizes that the subject property is only twelve years of age, and finds that the age-life method is reliable to establish depreciation/obsolescence. Additionally, since the property is fully occupied and substantially utilized as originally intended, there is little or no evidence of economic obsolescence. Therefore, this court finds that the opinion of the municipality’s appraisal expert, of a 20% combined depreciation/obsolescence factor, is reasonable based upon the evidence. The 20% factor ($1,437,500) deducted from the aforementioned replacement cost ($7,188,500 rounded), produces a depreciated value for the subject improvements in the amount of $5,750,000.[4]
As part of the cost analysis of the subject property, the municipality’s appraiser provided a land sales analysis. The witness analyzed three comparable sales and made the necessary adjustments for time, location, and physical characteristics. With respect to physical characteristics, the witness considered size, zone, topography, and sub-soil conditions. The three comparables were adjusted to the subject property. The adjusted comparables indicated per acre values for both assessment dates (October 1, 1994 and October 3, 1995) of $269,900, $267,100, and $285,600. The witness concluded the value of the subject property should be $275,000 per acre, -which is the median of the comparables. Since the subject property consists of-2.81 acres, the value of the subject land for use in the municipality’s cost analysis totals $635,000.[5] When this amount is added to the depreciated value of improvements ($5,750,000), the total value is $6,885,000. Finally, the municipality’s expert witness added a 10% factor for entrepreneurial profit. He concluded that a 10% factor is standard in the industry as of the relevant assessment dates. He further suggested that entrepreneurial profit factor should be applied to land and *36 improvements since the investment involves both. Thus, the witness added the 10% factor ($638,500) to the previously indicated value ($6,385,000), producing a final value for the entire property as of the relevant assessment date of $7,023,500, which the witness rounded to $7,000,000.
The municipality’s witness inspected the property, with the exception of the tunnel, and with one exception, this court finds his cost estimates reasonable and supported by the evidence. The one item in the municipality’s analysis that this court does not find supported by the evidence, and that is the valuation of the tunnel linking the subject property with an adjoining parcel.[6] The municipality’s expert suggested a cost estimate of $500,000 for the tunnel. The witness acknowledged never having examined the tunnel and was unfamiliar with the method of its construction. Moreover, the witness’s valuation was based solely on the section in Marshall & Swift dealing with cost factors of tunnels. There was reliable testimony supporting the fact that the tunnel is the one area of the subject property not utilized by taxpayer as of the relevant assessment dates. Since there was no reliable evidence to determine cost, there is no basis from which this court can determine the value of the tunnel. This court finds that the municipality'has failed to establish any reliable evidence of value. No cost factor for same shall be included in this court's determination of the overall value of the subject property. In all other respects, this court accepts the cost analysis submitted by the municipality’s appraisal expert.
The Supreme Court in Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985) held that the Tax Court should determine value from the evidence submitted, based upon the Tax Court’s knowledge and experience. The Supreme Court in Glen Wall quoted the following from New Cumberland Corp. v. Roselle, 3 N.J.Tax 345, 353 (Tax 1981):
*37 The Tax Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question.
[Id. at 280, 491 A.2d 1247 (citations omitted).]
This court applied the cost approach based upon the property’s highest and best use, which is that of a telecommunications facility and office. Accordingly, this court finds as follows with respect to the valuation of the subject property:
Basic replacement cost new $5,670,951
Costs not included above 80,000[7]
Total construction costs $5,750,951
15% increment for location on rock formation additional cost 862,642
Total Construction Costs $6,613,593
Less 20% Depreciation/Obsolescence 1,322,718
Depreciated Replacement Cost of Improvements $5,290,875
Total Land Value 635,000
Total Property Value $5,925,875
Add 10% Entrepreneurial Profit 592,587
Total Value of Subject Property for 1995 & 1996 - $6,518,462
As such, this court rejects the taxpayer’s analysis under the cost approach because it is premised upon the property’s highest and best use as that of a data center.
The average ratio promulgated by the Director of the Division of Taxation for the Township of West Orange is $50.47% *38 for 1995. The upper limit for 1995 is 58.04% and the lower limit is $42.90%. The 1996 average ratio is 51.78%, with the upper limit as 59.55% and the lower limit as 44.01%. The ratio of assessment ($5,854,500) to this court's finding of true value ($6,518,462) is 89%, which is clearly above the upper limit of the common level range. Therefore, the court will grant .Chapter 123 relief for both years in question pursuant to N.J.S'.A. 54:51A-6(a).
Accordingly, the application of the average ratios to true value as found by this court results in the following unallocated assessments for each year in question:
1995 $3,289,900
1996 $3,375,300
Since the court’s determination as to value is set forth in the aggregate for land and improvements, the parties are directed, pursuant to R. 8:9-3, to submit an agreed upon allocation of land and improvement assessment for purposes of entry of judgment. Such allocation shall be submitted within fifteen (15) days. If the parties are unable to agree, pursuant to R. 8:9-3, said assessment allocation shall be made by this court and judgment shall be entered in accordance therewith.

 The first three floors of the subject, as hereinafter discussed, primary house equipment as opposed to personnel. Thus, fewer parking spaces were required for taxpayer's use than if the property was entirely utilized as office space.

 This lease agreement was a part of the sale of the subject property from Vicon, the seller, MCI, the buyer, in 1983.

 The municipality's appraiser made minor adjustments to the total cost of the structure, resulting in a figure of $5,508,451.

 There are minor errors in the appraisal expert's calculation, which do not affect this court's final determination.

 Taxpayer's land analysis, based upon taxpayer's conclusion as to highest and best use, produces a total land value of $1,100,000.

 This parcel is also owned by the taxpaj'er but not under appeal herein.

 This tabulation eliminates the $500,000 cost estimate for the tunnel