PIZZUTO, J.T.C.
This local property tax case concerns the corporate headquarters of Best Foods (formerly known as CPC International, Inc.) at 680-700 Sylvan Avenue (Block 808, Lots 7 & 9) in Englewood Cliffs Borough. At issue is the 1998 assessment in the aggregate amount of $35,022,770. Plaintiff contends the property had a value on the relevant assessment date (October 1, 1997) of $15,000,000, while defendant contends the value on that date was $42,500,000. The average ratio of assessment to true value determined by the Director of the Division of Taxation for use under N.J.S.A. 54:51A-6 (commonly known as “chapter 123”) in 1998 Englewood Cliffs tax appeals is 88.03%. Under chapter 123, a valuation of $42,500,000 would leave the assessment unchanged, while a value at any figure less than the assessment would produce an assessment of 88.03% of the value found.
*269 The facility was constructed in 1967-68, and the property has been the subject of previous tax appeals. In CPC Int’l, Inc. v. Englewood, Cliffs Bor., 193 N.J.Super. 261, 473 A.2d 548 (App.Div. 1984), certif. denied, 97 N.J. 578, 483 A.2d 124 (1984), the Appellate Division, addressing appeals for 1978, 1979 and 1980, disallowed a 16% reduction in the value of the improvements for functional obsolescence, considered as “the diminution of a building’s market value resulting from the fact that it contains costly features which were installed to gratify the owner or which are unique to the special purpose of the building but which do not enhance its value on the market.” Id. at 265, 473 A.2d 548. In his concurring opinion, Judge Joelson concisely articulated the conclusion that “[h laving decided that opulent campus-type headquarters would enhance the prestige of its corporate image, the corporation here should pay taxes on the basis of the value to it of its headquarters as long as it occupies them.” Id. at 271, 473 A.2d 548. The assessments for 1989 and 1990 were appealed to the Tax Court, and in an unreported opinion Judge Crabtree noted the Appellate Division’s earlier decision and determined that the cost approach was the appropriate valuation method for a headquarters facility of this character. The total assessment established for 1990 continues to be the assessment for 1998.
The facility consists of lour connected buildings, comprising (as configured on the assessment date) approximately 265,000 square feet of enclosed space, located on approximately 22.6 acres. It contains extensive interior and exterior amenities of both utilitarian and aesthetic character. The design and placement of the buildings, with interior courtyard space and connecting bridges, does not utilize the maximum building potential of the site, as permitted under the provisions of the local zoning ordinance applicable on the assessment date. Approximately 80 years old on the assessment date, the buildings contain asbestos, which complicates the accomplishment of needed roof replacement. The mechanical systems have aged and fall short of the efficiency of those in moi-e modern buildings. The exterior facing of the buildings, consisting in large part of single-pane glass, also contributes to inefficiencies in heating and cooling.
*270 Both appraisers consider that the highest and best use of the property is continued employment as a corporate headquarters. Each appraiser has considered the three approaches to value (cost, sales comparison and income capitalization). Defendant’s appraiser utilized the cost and income capitalization approaches in reaching his conclusion of $42,500,000. Plaintiffs appraiser relied on all three approaches to support his value of $15,000,000.
Each appraiser has attempted to value the property in its current condition and use. The significant difference in the value conclusions flows from the differing treatment the appraisers accord to the roof, asbestos and systems conditions. Defendant’s appraiser considers the existing use to be the highest and best use, while plaintiffs appraiser expresses his highest and best use determination as the continuation of the existing use after substantial rehabilitation to address these conditions. In adjusting comparable data and in computing depreciation under the cost approach, defendant’s appraiser does not consider the property to require extensive renovation. Plaintiffs appraiser has estimated a cost to cure the roof, asbestos, and systems conditions, and he treats this amount as a deduction taken in the cost and income approaches from the value of the property, as renovated, to arrive at current value. In so doing, plaintiffs appraiser takes the decision in American Cyanamid Co. v. Wayne Tp., 17 N.J.Tax 542 (Tax 1998) aff'd, 19 N.J.Tax 46 (App.Div.2000) as a “road map” for the valuation of property requiring substantial rehabilitation.
Plaintiffs appraiser also undertook a sales comparison analysis in which he examined five sales of large single-occupant properties requiring either completion or substantial renovation. He concluded a value for the subject of $38.00 a square foot. Only one of those properties was in Englewood Cliffs. Although defendant’s appraiser did not give significance to the comparable sales approach, he noted that three sales of large single-occupant properties in Englewood Cliffs during the 1990-1999 period reflected a range of $154.00 to $205.00 a square foot. Two of the three sales were in the immediate vicinity of the subject, an area of large, mostly single-occupant office buildings attractively designed and situated. The third transaction was a subsequent sale, after *271 renovation, of the Englewood Cliffs property whose earlier sale was included in the other appraiser’s analysis. These transactions identified by either appraiser are not particularly helpful in valuing the subject, given the difficulties of adjusting for location and condition.
In elaborating the income approach, the appraisers do not diverge greatly in many of their conclusions. Plaintiffs appraiser considers $15.50 a foot to be the indicated economic rent on a net basis, while defendant’s appraiser’s net rent is $15.00. Their expense allowances are, respectively, $331,998 and $332,500; and their capitalization rates are, respectively, 9.5% and 9.652%[1] They differ, however, as to vacancy rate, with plaintiffs appraiser using 10% and defendant’s appraiser 3%. They also use different rentable area figures, 264,434 and 272,000 square feet for plaintiff and défendant, respectively. If a valuation factor is computed on a unit basis in order to eliminate the effect of the building size discrepancy, and if expenses are considered to be $1.25 a square foot, the conclusions are seen to be approximately $134.00 a square foot for plaintiffs appraiser and $138.00 a square foot for defendant’s appraiser. Considering the subject to be an office building of the highest quality, defendant’s appraiser concluded $138.00 a square foot as his final income approach figure, while plaintiffs appraiser, employing American Cyanunnid as his model, deducted a renovation cost of $19,937,200 or about 56.4% to arrive at his final income approach conclusion.
Under the cost approach, plaintiffs appraiser’s analysis of vacant land sales in other taxing districts yields a valuation factor of $27.50 a square foot of potential building area, as permitted under the applicable zoning ordinance. He applies this factor to his measure of subject’s actual area (264,434 square feet) for a land value of $7,272,000 (rounded). Defendant’s appraiser looks to *272 Englewood Cliffs land sales and concludes a valuation factor of $30.00 a square foot of potential building area. He applies this factor to his calculation of the maximum potential building area under the zoning in effect on the valuation date (498,000 sq. ft.) for a total land value of $14,940,000.
In estimating replacement cost new, plaintiffs appraiser analyzes Marshall Valuation Service data using the segregated cost method, under which costs for individual building components are separately calculated. His total construction cost new is $39,029,506, to which he adds 10% for soft costs and entrepreneurial profit for a total cost component for improvements new of $42,935,500 (rounded).[2] To arrive at the depreciated value of the improvements, he again subtracts the renovation cost of $19,937,200. He also subtracts a further 25% of total cost new or $10,733,114 to account for the age of the basic structural components whose renovation is not projected. Both of these depreciation adjustments, which produce a depreciated improvements figure of $12,265,200 (rounded), he considers appropriate under the American Cyanannid paradigm. His final cost approach value is then the sum of the $7,272,000 land component and the depreciated improvements component of $12,265,200 for a total of $19,537,200.
Defendant’s appraiser also used Marshall Valuation Service data, but used the calculator cost method under which cost is estimated for given improvements essentially on the basis of total area, rather than for separate components. His total cost new for improvements (exclusive of site improvements) is $33,500,478, from which he deducts 35% depreciation for a depreciated cost of $21,784,000 (rounded)[3]. To this figure he adds $2,442,000 for the *273 depreciated cost of site improvements and his land value of $14,940,000 for a total (before allowance for entrepreneurial profit) of $39,166,000. The appraiser adds 10% of this total figure for entrepreneurial profit for a final value conclusion under the cost approach of $43,082,600.
A judicial determination of the value of the subject property on this record requires first the selection of the appropriate appraisal approach or approaches and then the resolution of the differences in the appraisers’ handling of the data. Notwithstanding its age, the property remains a corporate headquarters facility, uniquely designed for the special purposes of the owner. As such, it is most appropriately valued under the cost approach. See Brae Assocs. v. Park Ridge Bor., 17 N.J. Tax 187 (Tax 1998), aff'd, 19 N.J.Tax 306 (App.Div.2001); Beneficial Facilities Corp. v. Peapack & Gladstone Bor., 11 N.J.Tax 359 (Tax 1990), aff'd, 13 N.J.Tax 112 (App.Div.), certif. denied, 130 N.J. 397 614 A.2d 619 (1992). This is not to say that employment of the cost approach to value property of this kind is legally required. Rather, the special purpose and design characteristics of this kind of property ordinarily make it difficult in practice to identify clearly comparable market data, and the use of the cost approach is, accordingly, indicated by appraisal principles and considered reasonable as a matter of law.
Once the cost approach has been selected in the instant case, determinations must be made concerning land valuation, replacement cost, depreciation and entrepreneurial profit. These questions will be considered in that order.
The appraisal treatise generally recognized as authoritative describes the first step of the cost approach as estimation of “the value of the site as though vacant and available to be developed to its highest and best use.” Appraisal Institute, The Appraisal of Real Estate 340 (11th ed.1996). Where the site has been underutilized, this approach nonetheless ascribes a value to *274 the land in light of its greater potential for development. In the present ease, both appraisers employed a unit valuation factor expressed in terms of building size. Plaintiffs appraiser used his estimate of actual building size, while defendant’s appraiser made a calculation, not controverted on the record, of the maximum building area permitted under the zoning in effect on the assessment date. He is careful to note, however, that the actual configuration of the existing buildings does not permit additional development.
Plaintiffs appraiser’s unit factor ($27.50 a square foot of building area) derives entirely from land transactions outside the taxing district, four of the five chosen from outside Bergen County. The unit factor ($30.00 a square foot of building area) derived by defendant’s appraiser is accepted as ■ more reliable, given its basis in Englewood Cliffs transactions. Moreover, it is reasonable to infer, in the neighborhood in question and absent a demonstration to the contrary, that property development to maximum potential is feasible, and that underdevelopment is the deliberate choice of the corporate user. An analogy to'residential property may be helpful. An owner who constructs a house at the center of an oversized lot, especially one capable of subdivision, has a more valuable property than a neighbor who has a lot of minimum size for the zone, developed with a house of the same size; and the difference is a difference in land value. It is not, strictly speaking, a question of the property’s potential for development in addition to that which existed on the appraisal date, but of the value contributed by underutilized land. In this action, only defendant’s appraiser has attempted to quantify that value, and, on the present record, that appraiser’s land value is accepted.
American Cyanamid, Co. v. Wayne Tp., supra, 17 N.J. Tax 542, recognizes a variation of the cost approach to account for needed renovation or modernization. In this variation, the replacement cost new of a structure built to current standards is determined and the cost of accomplishing a renovation of the existing structure to the same standards is considered a component of depreciation. In the present case the evidence amply demonstrates the need for roof replacement, asbestos abatement, *275 systems renovations and substitution of double-pane for single-pane glass to produce a corporate facility of prime quality on the assessment date. Plaintiff produced several expert witnesses, engaged by the corporation for purposes independent''‘of the tax appeal, who explained the condition of the property in these respects and developed estimates of the cost of modernizing the facility.
Plaintiffs appraiser employed this material following the American Cyanamid model. His cost new is a reasonable estimation of the cost of constructing a modern facility, utilizing building dimensions that derive from construction plans. His depreciation analysis tracks that of Am-erican Cyanamid. Apart from a suggestion that a less costly asbestos abatement alternative might be available, defendant did not controvert the renovation or modernization estimates. With one important qualification, plaintiffs appraiser’s depreciated improvement cost calculations are accepted. That exception concerns the allowance of an additional 25% of total cost new after the deduction for renovation. The basis for this allowance is, in part at least, the inclusion of the same percentage allowance in American Cyanamid. The appraiser considers that it adjusts for the age of the basic structural elements that are not renovated. Neither this appraiser nor the expert in American Cyanamid explained why, after taking a substantial depreciation allowance for a cost to cure, the physical age deduction should be calculated on a base that includes the amount already subtracted. One hundred percent of the renovation costs having already been taken as depreciation, it appears adequate to apply the 25% physical age factor to replacement cost after (rather than before) the renovation allowance. Computing it in that fashion (25% of $22,998,300, rather than $42,935,500) produces a figure of $5,749,600 (rounded) in place of $10,733,114. With this change, plaintiffs appraiser’s depreciated cost calculations are accepted.
A brief discussion of the appraisers’ treatment of entrepreneurial profit is required. Defendant’s appraiser’s inclusion of the land value in the base on which the 10% entrepreneurial profit *276 adjustment is calculated is inconsistent with the manner in which the cost approach was employed in Brae, Beneficial and American Cyanamid. See also The Appraisal of Real Estate, supra at 349-50, 356-360. The prevailing practice, accepted here as reasonable, is to calculate the 10% entrepreneurial profit factor only on the improvement cost new, as plaintiffs appraiser has in the calculation previously accepted.
The final calculations, employing the cost approach, are as follows:
Replacement cost new $42,935,500
Less:
Allowance for renovation/modernization ($19,937,200)
Physical depreciation ($ 5,749,600)
Depreciated Cost $17,248,700
Land $14,940,000
Total Value $32,188,700
Since the assessment exceeds the value found, chapter 123 requires a reduction of the assessment to the value multiplied by the average ratio (.8803). The assessment is therefore determined to be $28,335,700 (rounded), allocated so as to preserve the original land component of the assessment and take the reduction from the improvement component, unless counsel for the defendant advises within 15 days, on notice to plaintiff, that the assessor has chosen a different allocation.

 9.652% is defendant’s appraiser's capitalization rate before an .adjustment for "equity build-up" of—.827% for a net rate (rounded) of 8.82%. The equity buildup adjustment is intended to account for the changing ratio of equity to debt over a given holding period as a mortgage loan is amortized. It is not generally made in the band oí investment capitalization method employed by both appraisers. Appraisal Institute, The Appraisal of Real Estate 517-519 (11th ed.1996).

 The figure resulting from addition of entrepreneurial profit is recited in the appraiser's report as $42,932,500, but later total cost new is stated to be $42,935,500. The second figure is utilized in this opinion, since it was the appraiser's base for his percentage physical age depreciation deduction.

 This figure is derived from a summary in the appraiser's report. The summary appears to overstate his intended depreciated cost for Building "C" by $8,500, and, therefore, to reflect total depreciation of slightly less than 35%. *273 The summary figure is recited in this opinion to preserve consistency with the appraiser's stated conclusions.